Thank you. May it please the court, my name is Barry Paisner, and I represent Millie Shaw, who is a Navajo WILO KT. I appreciate the court giving us this opportunity to present her case and hopefully answer any questions you may have. This court's review is that a hearing officer's decision under or pursuant to the Administrative Procedure Act is our position that the hearing officer's decision in this case is arbitrary and capricious, is not based on substantial evidence, and is not in accordance with the law. And under the Administrative Procedure Act, it must be vacated and remanded. The review of the hearing officer's decision falls into three categories. The hearing officer failed to apply the law not to solve correctly. The hearing officer failed to reconcile his divergent factual findings from Mrs. Shaw's sister's case with her case. And his findings that Ms. Shaw changed her domicile because she did not engage with traditional women on the customary use area is not based on substantial evidence. So, Mr. Pesare, you listed them in a particular order. I'm assuming you want to take them in that order, which would follow the briefing. But the first issue with respect to domicile, as I understand your argument, it's that because the Settlement Act and then the implementing regulations refer to residents and legal residents, that imports the doctrine of domicile, which you then argue means that we should import that doctrine as applied in diversity jurisdiction. But I didn't see any citation to authority to support that. Do you have any statutory, regulatory, or case law that you could cite to support that we should apply that doctrine as it's understood in the context of diversity jurisdiction? Well, Your Honor, it's true that it is used in diversity jurisdiction. But the law of domicile, in the Ninth Circuit especially, is pretty universally understood to include the presumptions of domicile. Mr. Pesare, the problem I think I'm having with your argument, or the question I have, is that I didn't see any authority to support that. And you're making that argument in the face of pretty clear statutory language that says that the petitioner has the burden of proving residents. But there's nothing in the statute or the regs that I could find, and if I've missed it, please let me know, that suggests any kind of a burden-shifting framework. It all seems pretty straightforward. The petitioner has to establish residents. Even if residents means domicile, there doesn't seem to be anything that suggests that if she were able to establish domicile at some point in the past, then the burden shifted to the defendant to show that it wasn't her residents. Your Honor, what we rely on is, beginning in 1985, in a case that's included in the addendum to the reply, it's the matter of Lorenzo Smith, and that was in 1985, that was quite a while ago, Your Honor, that the hearing officer stated that the legal residence is pursuant to the act the same as domicile. Okay, I understand that part of your argument. But I think there's another step that we'd have to take, which is to say that burden-shifting, that concept is applied in diversity jurisdiction, now also applies under the Settlement Act. I mean, you're asking us to make that step, isn't that correct? I'm asking that the domicile presumptions that are found in the restatement of contracts, bankruptcy cases, virtually all federal cases dealing with domicile. I would say all federal cases. But just to be clear, none of those cases are talking about the Settlement Act, and the restatement is not either. So you're talking about some general principles or propositions in the face of the statutory language here. Yes, that's correct, Your Honor. There is nothing in the regulations or the Settlement Act that specifically say that the presumptions of domicile apply. But if the court is going to use – there's also, on the other hand, Your Honor, nothing that says everything applies for domicile except the presumptions. To me, that leads to irrational analysis. If domicile law applies, how can you take out the presumptions, you know, that you can only have one domicile at a time, that a change in domicile requires a confluence of physical presence in a new location and an intention to remain in the new location indefinitely? The court's favor of established domicile against a newly acquired one, those are – I don't want you to spend all of your time on this. I know the other judges want to ask a lot of other issues. But it seems like some of those concepts seem to be directly contrary to the way the Settlement Act has been applied. So, for example, in Ms. Shaw's case, that she had a residence on the Navajo partition land but then argues that she should also be considered a resident of the Hopi partition land because of customary usage, which would have more than one residence. And if it means domicile, then you're saying, oh, we have to apply the presumption there's only one domicile. To me, all I'm suggesting to you is there are a lot of reasons why, as a doctrinal matter, this is not a good fit. But please go ahead. I think you probably want to turn to the other issues.  This matter arises out of a customary use area, which is, I believe, a specific Navajo land tenure that is developed over the generations, where by use, and in this case by the Daw family use for generations of a specific area, and it becomes a recognized land tenure area within the reservation. What happened with the Daw's area was that it became part of the land dispute and the former joint use area. And it wasn't until after the acts, December 22nd, 1974, an offense went right through their property that this family realized that they had lost a big portion of their land because of relocation. They'd lost a large portion of their residence. Mr. Paisner? Yes, ma'am. Yes, this is Judge Schroeder. I have a question. As I understand it, the party stipulated that the Hogan, where they slept in the winter camp, was on the land that was later apportioned to the Navajo. Could I ask you what was in the area on the other side of the fence? There was a water well, a cornfield, obviously grazing areas, and a camp was on there. I know the record is not totally clear about this, but it seems evident to me that they would spend the night on the HBL in the winter camp. Ms. Shaw testifies that when she came back from high school, she stayed with her mother in the winter camp, and she would feed the goats while her mother weaned her up. The Hogan was on the winter land that became Hopi land, or it was on the land that stayed Navajo? I think at the time, in 1975, the Hogan was on what we call the Navajo partition land, the land given to the Navajos. I believe that the sweat lodge, which was right near the Hogan, was on that Hopi partition land. I mean, the fence came right to their property. So there were those buildings that were on the other side, and there was grazing land and all of that on the other side, is that right? Right. There was a water well, which, as you know, in the Southwest is very, very, well, the whole town knows, is very important. There was a water well, and the customary use areas of Minnie Woody's standard does not, does not, it's still determined that she lost her property, even though, even if, as in Minnie Woody's case, the primary residence was on the MPL. That is not what the Minnie Woody standard is. The Minnie Woody standard is that, and the hearing officer states it in Minnie Woody, and I can quote it, that, that the undersigned has repeatedly stated in his decision where a traditional use area has been proven, in proportion to that traditional use area, in proportion to the tribe, which the applicant is not a member, the entire area will be treated as having been taken. Prior decisions have acknowledged cornfields, grazing areas, and the like, despite the fact that the primary residence has not been partitioned to the other tribe. I mean, in Minnie Woody, that paragraph almost seemed like it was written for... Mr. Paisner, a couple of things. One, I seem to recall reading in the testimony that the sweat lodge was moved from HPL to MPLN, and I can't find a part of the testimony now, but I'll go back and find it later. I was reading through the transcripts this morning again, that the sweat lodge was moved. And then, with respect to Minnie Wood, the Minnie Wood case, that case talks about individualized determinations and activities, what Ms. Wood was doing directly, not what her family was doing. And your brief and your argument seems to be based on the Shaw family activities rather than Millie Shaw's activities. For example, the cornfields, she never says anything anywhere in her testimony about doing anything with the cornfields. Her sister talked about that, but she didn't. Right. Did she testify? Oh, I'm sorry, Judge. No, go ahead. Go ahead. Did she testify that after the baby was born in May of 74, that every morning she went to the winter camp to help her mother? Yes. And all that was there was the sweat lodge, the well, and grazing and corn. She testified that when she returned in 1972 from boarding school, because her sister had passed away, to be with her mother. Her mother was at the winter camp, which is the Hopi partition land camp, and that she would, I mean, part of her testimony is that she would feed the baby goats while her mom wove a rug. I don't know if you can come up with a more traditional picture of the debate than a young woman feeding the goats on the HPL while her mom wove a rug. She said that she helped her mom every day with the sheep. She helped her dad haul flecky herbs, haul water, and chop wood. That was all on the HPL. I mean, I think, Judge, you're right that she did not specifically say she worked in the corn field that I recall. Well, her testimony is about 20 pages. I read through it again this morning. She doesn't quite say the things you're representing. I think you're saying a bit more than what she said. But in any event, you're down to a minute, just over a minute. Did you want to reserve your time? I have reserved three minutes for rebuttal. Right, so you have what's left. You have a minute now. Okay. Thank you. Thank you. All right, Mr. Toth. Thank you, Your Honor. May it please the Court, Brian Toth representing the Office of Navajo and Hopi Indian Relocation, which I'll refer to as ONER. At issue in this case is whether the hearing officer's determination that the plaintiff did not reside on the Hopi partition lands as of the date of the Settlement Act's enactment is supported by substantial evidence. Viewing the hearing officer's decision in the light of the standard of review under the Administrative Procedure Act, it's very favorable and deferential to the agency. The record rationally supports the conclusion of the hearing officer that Ms. Shaw was not a resident of the Hopi partition lands as of December 22, 1974. When you say, Mr. Toth, when you say she was not a resident, what do you mean? So the way ONER defines residence is legal residence, which in its preamble to that regulation, it says, means intent to reside coupled with manifestations of that intent to reside. And it goes on to list a number of factors that it typically considers. Here, it's sort of a not your usual residence case because the plaintiff is relying entirely not on a dwelling structure located on the Hopi partition lands, but on the presence of a traditional use area. To take advantage of that theory and prove her residence under that theory, she would have to demonstrate that she personally used and continuously used the Hopi partition land portion of that traditional use area. She doesn't have to show that she slept there. Correct. Yeah, my friend is correct that she doesn't have to demonstrate she had a dwelling structure on the Hopi lands themselves. Was there any contradictory evidence that other than when she stated that after her baby was born in May of 74, that every morning she went to help her mother on the winter camp, which was located partially on the Hopi land and partially on the Navajo land? I'm not aware of any contradictory evidence of her going back, of that fact that you just stated, of her going back and forth every day. I think the issue is what she did on the Hopi portion of the lands. And it's not enough that her family members use the lands or either her father or brother or her other sister. It's really up to her to prove that she was making use of the lands, the Hopi portion. Mr. Tut, this is what I don't understand. The evidence is pretty clear. She was helping her family. I don't see any evidence in the record that she was doing anything else. She had a child, but there's no evidence that she was spending all of her time changing diapers. So I don't see what else she would be doing other than helping her family and her family was using that land. So what evidence is there that she was doing something else just on the Navajo land? It's her testimony at pages 189 of the record, where she unequivocally says that she did not hurt sheep on the Hopi side of the fence. I understand Your Honor's point about the family participating in activities. But I would ask the court to focus here on the time period between when she had her child in May, which is when she becomes the head of household. And then just seven months later, December of 1974, when the act is passed. That's the limited time window we're talking about where she'd have to be producing evidence to carry her burden. But she testified that she was helping the family. And the family was using the land that later became the Hopi petition land. Right. In traditional uses. Yeah. Not necessarily. I mean, she testified that she was helping her mother in some fashion, but she doesn't say what she was doing necessarily. I thought her argument that she was helping the family was that she hauled wood, she hauled water and herding sheep. Which is contradictory to her clear testimony. She only engaged in sheep herding on Navajo land. And her brother Eugene's testimony that he was the only family member who had the sheep on Hopi land. And they weren't great there. He was catching them in a recovery area when they got onto that land and bringing them back. So what we're left with is her claim of hauling wood and water. And then the question is when or where. Because it's not clear to me from the transcript where she did any of these things. And what it was she was doing to help her mom. I mean, she's over there. Her mom's weaving. She said she wasn't weaving. I mean, what is she doing that becomes a traditional use of the continuous and that she's dependent on it. That she's doing it continuously. That she's personally doing this. That she's doing this traditional use. Minnie Woody, who is the example that my friend gives of a case where traditional use was recognized. Was 47 years old approximately at the operative date that we were talking about. Michelle was 18. So, you know, she's just beginning her life as an adult. She hasn't reached the status of living as a traditional elder lifestyle as was recognized in Minnie Woody. And Judge Beatty, I would agree with you. I think there is some evidence in the record that her family was carrying on activities. But it's not very specific as to the location when it comes to the winter camp. Was the water well on the Hopi land? I thought the water well was located on what became a Hopi land. I think that's correct. It's not clear she was relying. I mean, she has mentioned going to get water. Yeah, you know, it's an issue of the burden here. Was there any contradictory evidence that she was doing other than hauling water when she said I hauled water to help the family? That the well was located on any other place than the Hopi land? No, I don't have any other evidence about the location of the well. I mean, I think. Isn't that a traditional use, though, of hauling the? Well, here's the well water. Yeah, I think, you know, I'm not sure that that may be part of the traditional lifestyle of, you know, watering the livestock and using the livestock for various purposes, making wool, making rugs and all of that. She didn't do the weaving part, as Judge Beatty noted. But, you know, this is supposed to recognize her as her own head of household. She was not claiming that she is part of her family's household. Her father already got benefits. His wife, Plaintiff's mother, received benefits because she was part of the same household as Charlie Doll. A household is a term of art. Head of household here is a term of art, I think. She's still part of the family unit in that sense. Right. No, and it's true. There are sometimes multiple families under the same roof. What was the reliance in the finding of the 1975 reliance as some kind of evidence that she was not there? So this is a roster prepared by the Bureau of Indian Affairs in 1975. And it's one of the factors mentioned in the preamble to the regulation that O'Neill considers in determining residence. It's not the sole piece of evidence. And here it was a factor pointing toward non-residents. What could it be, though? I'm not understanding how that could be. They could use a 1975 survey to determine where she was in December of 74. So I think the surveys were taken in 74 and carrying on to 75 for some of the residents. Is that in the record? I can't recall where it is. I believe it is, but I don't have the page offhand. But it's not the determinative piece of evidence. We mention it simply because it's one of the pieces that O'Neill considers that is allowed to consider in its preamble to the regulation. What was really dispositive here, I think, was the lack of demonstrating her personal use of the area, apart from helping her family. And I understand the emphasis on that. But for this policy to really apply in the sense of giving each person in the house their own relocation house, I mean, this is more than one house per house. This is multiple houses that have been received for this particular house where several families are dwelling. So I thought that she became a household. When she had her child, she effectively becomes a household. But I think this policy is an informal one that the hearing officer has applied from time to time. It's not codified in regulation. So it's flexible. And the argument by my friend is that the hearing officer was compelled to find this traditional use area made her a resident. And I don't think that it's compelled. I mean, it may be a situation where the record could go either way and the hearing officer made a call that was a reason one. It was supported by Ms. Shaw's unequivocal testimony that she was not herding sheep on the Hopi side of the line. And I think that was adequate to support a reasonable conclusion. Did the hearing officer explain why he reached a different conclusion with other members of the family? Why she was different? He didn't expressly mention that. I think the way he accounts for it, it's sort of oblique, but he calls the whole winter camp as the HPL camp. So I think he's accounting for the fact that the parents were recognized as residents of the HPL saying, well, she moved off of that camp effectively. What was the evidence that she moved off again? Well, she did move later to her own structure, but that was some years later. So I don't think the hearing officer, what I'm trying to say is the hearing officer didn't expressly address this. But I think he did attempt to reconcile it in some fashion. It's fairly oblique in the record, but I think it satisfies. Do you know what the evidentiary factual basis was different between the sister and this Ms. Shaw? Marie Daw's testimony or her hearing transcript from her proceedings is in the record. And if you look at the pages of the record, I would direct you, we set it in our brief. It's 266 to 67, 269, 273, and 277. She provides specific testimony that she used a cornfield on the HPL, that she gathered wood there, and that she herded sheep on the HPL every day. That's her quote is every day. So she provides the type of specific evidence that I think is lacking here in Ms. Shaw's case. And, you know, these are individualized determinations. These are not precedential decisions. And I understand the need to treat, I mean, I acknowledge the need for the agency to treat similarly situated individuals similarly, but there are different evidentiary records. And we're talking about different uses. In Marie Daw's case, there was no testimony about Ms. Shaw's use of the traditional area. It was all about Ms. Daw, Marie Daw's use of it, and her family's, but not the plaintiff appellant here. So the big difference between then and now is that she didn't have Mr. Paisner at the hearing. I'm not sure, yeah, I'm not sure of the council lineup. I mean, there are a number of these cases coming up. There have been a number that have come through already. The agency, as you know, its mission is envisioned to end at some point. And it has reopened the application period several times in a very generous fashion, applying the standards very generously. So we're looking at, if you look at the Office of Inspector General reports, I don't think we cited the 2020 report, but it estimates that there are about 200 cases or so that have not yet been appealed and are still subject to a six-year statute of limitations and could be appealed. So there are likely more of these decisions to come along. Mr. Paisner is certainly an effective advocate for his clients. He's been in a number of these cases. But I think the consequences here for adopting the proper standard could be significant. I think it's important to look at the argument by my friend who suggests that domicile law has to be adopted. As Judge Beatty points out, that's inconsistent with the O'Neill's regulations that both place the burden of proof upon the applicant and that also focus on proving residence as of a single date and time, unlike the normal way of looking at domicile law as changing over time and the events that might lead to a change in domicile. So I would suggest the court either find the argument forfeited here, as other courts have found in similar circumstances, or that it make clear that the law of residence is what applies by virtue of the regulation that O'Neill has and that it does not wholesale adopt the presumptions or burden-shifting scheme that the plaintiff suggests in the briefing. But I would submit that although there is evidence potentially going both ways on residence here, I think the unequivocal testimony by Ms. Shaw that she did not herd the sheep on the Hopi side was enough here to support the application and to correct application of the traditional use policy by the agency. And for that reason, the district court's decision and the hearing officer's decision should both be upheld. All right. Thank you, Mr. Todd. Mr. Paisner should have a little over a minute. Thank you. Wait for the clock. Hold on a second. Since I just have a minute, I'll try to do this quickly. Mr. Toth mentioned that she did not cross the fence when the fence went up in 1975. This is just following on the hearing officer's error. She also used that date as if it was significant. But it's December 22, 1974, before the fence went up. Mr. Toth also said she moved her house. Well, the record shows her house was built on the Navajo Foundation land in 1982, another error that the hearing officer relied on. And what Judge Schroeder indicated is absolutely correct, that these are agrarian people. They're living off the land. If she's not herding the sheep, she's hauling water. Maybe she didn't get assigned herding the sheep. Maybe she was assigned taking care of the lambs, whatever. You do not survive in this arid, harsh climate without working the land. And that's what she did, and I think that's clear in her testimony. The issue is when she became head of household, that the commission states all the time, we do not relocate individuals, we relocate head of household. She became head of household when she had her child in 1974. Thank you, Mr. Payson. You've gone over. So we're going to take this case under submission, and thank you both for your arguments this afternoon. Thank you. Thank you.
judges: Schroeder, Jack, Bade